IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **CHARLES R. BRAZITIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 11 C 7993** |
| | ) | |
| **v.** | ) | **Magistrate Judge Cole** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Charles Brazitis seeks review of the final decision of the Commissioner of the Social

Security Administration denying his application for Disability Insurance Benefits ("DIB") under

Title II of the Social Security Act ("Act"), 42 U.S.C. § 423(d)(2), and Supplemental Security

Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3)(A). Mr. Brazitis asks the

court to reverse and remand the Commissioner's decision, while the Commissioner seeks an

order affirming the decision.  For the following reasons, the plaintiff's motion is granted.

**I.**
**THE PROCEDURAL HISTORY OF THE CASE**

Mr. Brazitis applied for DIB and SSI on September 16, 2008, (Administrative Record

("R.") 121, 127), alleging that he had been disabled since January 1, 2006. (R. 129).  His claims

were denied initially on November 14, 2008, (R. 61), and upon reconsideration on March 19,

2009. (R. 76). Mr. Brazitis filed a timely request for rehearing on April 1, 2009. (R. 89). An

administrative law judge ("ALJ") convened a hearing on March 5, 2010, at which Mr. Brazitis,

represented by counsel, appeared and testified. (R. 1). Julie Bose also testified as a vocational

expert. (R. 1). On April 20, 2010 the ALJ issued a decision finding that Mr. Brazitis was not

disabled because he could perform light work with only occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling and no climbing ladders, ropes or scaffolds, and there are jobs that exist in significant numbers in the national economy that he can perform despite those limitations. (R. 51, 55). This became the final decision of the Commissioner when the Appeals Council denied Mr. Brazitis's request for review of the decision on September 20, 2011. (R. 35). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Brazitis has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE

### A.
### The Vocational Evidence

Mr. Brazitis was born on March 22, 1959, (R. 41), making him fifty-one years old at the time of the ALJ's decision. (R. 8). He has a high school diploma. (R. 9). He last worked in 2003 as a lift truck operator and material handler (R. 12). Before that, he performed tire repairs. (R. 12). Mr. Brazitis's work history also included part-time maintenance for a mobile home park, a job that involved picking up trash and performing very minor repairs. (R. 13). Mr. Brazitis stopped working in 2003 because he was laid off. (R. 13).

### B.
### The Medical Evidence

The medical records begin on July 22, 2006, when Mr. Brazitis sought emergency care at Oak Forest Hospital of Cook County because he had been experiencing two weeks of weakness and dizziness, which worsened with exertion. (R. 199). Dr. Susan Arreola found Mr. Brazitis noncompliant with medication and had a medical history of hypertension, peptic ulcer disease,

and alcohol abuse. (R. 199). Mr. Brazitis was drinking one-half to one pint of whiskey and smoking a pack of cigarettes daily. (R. 199). The doctor assessed Mr. Brazitis as having asymptomatic anemia with gram positive stools; ordered a blood transfusion, EGD, and colonoscopy; and prescribed Pantoprazole. (R. 200). The doctor also found Mr. Brazitis to have alcoholic hepatitis and ordered IV hydration, thiamine and folic acid, and chlordiazepoxide to prevent alcohol withdrawal. (R. 200). For his hypertension, the doctor started Mr. Brazitis on Enalapril. (R. 200).

Mr. Brazitis next sought medical care on September 3, 2006, when he went to the Oak Forest Hospital emergency room and was admitted for alcohol withdrawal. (R. 206). He complained of feeling weak and generally fatigued. (R. 206). Mr. Brazitis reported being able to walk only four-to-five blocks before needing to rest due to fatigue, (R. 206), but reported being "independent for activities of daily living." (R. 207). Dr. Joyce Gertzen found that Mr. Brazitis had the following active problems: alcohol withdrawal, hypertension, smoker, alcoholic liver disease, anemia, and hypomagnesemia. (R. 209).

One year later, on September 20, 2007, Mr. Brazitis received emergency care and was found to have abdominal pain. (R. 198). Mr. Brazitis was admitted to John H. Stroger, Jr. Hospital of Cook County on September 21, 2007, (R. 241), and his chief complaint was dizziness and low hemoglobin. (R. 245). He also complained of generalized low energy and poor exercise tolerance for the last two weeks. (R. 244). Mr. Brazitis had an EGD, which showed a small exudative patch, evidence of erosive gastritis, a small non-bleeding angioectasia, and a single edematous erosion. (R. 239). Mr. Brazitis also had "complaints consistent with symptomatic anemia," (R. 241). On September 24, 2007, Mr. Brazitis was discharged with

primary diagnoses of microcytic anemia due to erosive gastritis and hepatomegaly with ascites and secondary diagnoses of alcohol use, peptic ulcer disease, and hepatitis C. (R. 241).

With respect to Mr. Brazitis's alcohol abuse, on October 11, 2007, Mr. Brazitis had a follow-up appointment where he reported abstaining from alcohol for twenty days and no complaints. (R. 237). On February 19, 2008, Mr. Brazitis also reported that he had stopped drinking alcohol in September 2007. (R. 231). But on February 27, 2008, Mr. Brazitis was admitted for detoxification from alcohol abuse. (R. 229–30). At a March 18, 2008 follow-up appointment, Mr. Brazitis reported that he had stopped drinking alcohol in February 2008. (R 225).

The record shows that Mr. Brazitis received regular medical attention for the next two years. He attended twenty-seven appointments, (R. 224, 228, 220, 222, 274, 277–78, 273, 272, 279, 280, 297, 298, 299, 303, 305, 306, 307, 308, 312, 313, 314, 315, 316, 320, 321, 322, 324), and two consultative medical examinations for his DIB and SSI claims. (R. 260, 255).

Mr. Brazitis showed some improvement at these follow-up appointments. At a June 24, 2008 follow-up appointment at Stroger, Dr. Luis Rivera found Mr. Brazitis's hypertension well-controlled. (R. 219). Mr. Brazitis had iron deficiency anemia due to erosive gastritis and duodenal telangectasis for which Mr. Brazitis was to continue on iron pills. (R. 219). For Mr. Brazitis's liver disease and hepatitis, the doctor encouraged him to continue not drinking alcohol. (R. 220). The attending physician found that Mr. Brazitis's liver cirrhosis and hepatitis C "clinically continue to improve." (R. 220). At an August 19, 2008 follow-up appointment, Mr. Brazitis reported that he "feels fine" with "no new complaints." (R. 222).

On October 28, 2008, Dr. Debbie L. Weiss with the Bureau of Disability Determination Services evaluated Mr. Brazitis. (R. 260). He reported that "his energy is very poor [and] he

naps one to two hours a day and sleeps a full eight-hour night." (R. 260). "He said he gets fatigued with minimal activity. He walks four blocks to his facility a day and he is fatigued." (R. 260). On November 10, 2008, Dr. Charles Kenney, a medical consultant, evaluated Mr. Brazitis for a Physical Residual Functional Capacity Assessment and found that he had hypertension and hepatitis but that the hepatitis did not "limit him to the degree in which he alleges." (R. 248, 255).

On January 14, 2009, Mr. Brazitis received an examination because of his history of cirrhosis, and the doctor found his liver enlarged and concluded that Mr. Brazitis had hepatomegaly with likely cirrhosis. (R. 279). Mr. Brazitis had a follow-up appointment on January 20, 2009, where he reported "feeling much better" and "feeling fine" with "no complain[t]s." (R. 280). The doctor reported that Mr. Brazitis had well-controlled hypertension and iron deficiency anemia due to erosive gastritis and duodenal telangectasis, recommended that Mr. Brazitis continue on iron pills, and noted that Mr. Brazitis said he had not been taking this medication for two months. (R. 281–82).

On March 24, 2009, Mr. Brazitis had another follow-up appointment where he reported feeling "less energetic." (R. 297). At a May 5, 2009 appointment, Mr. Brazitis reported "feeling fine" with "no complain[t]s." (R. 299). It is unclear when the doctor notes that Mr. Brazitis "stop taking iron pills" whether that was the doctor's recommendation or whether Mr. Brazitis was noncompliant. (R. 300). On August 18, 2009, Mr. Brazitis had an appointment where he complained of feeling "tired, fatigued, cranky." (R. 307) Later that month, at his August 25, 2009 appointment, the doctor noted that he "complain[ed] of fatigue since started on antiviral and [I]nterferon therapy." (R. 308). The doctor found Mr. Brazitis's hypertension well-controlled

and his iron deficiency anemia due to erosive gastritis and duodenal telangectasis resolved. (R. 309).

On September 8, 2009, Mr. Brazitis had another follow-up appointment where the doctor again noted that he was "feeling fatigued." (R. 312). On October 20, 2009, the doctor indicated that he had continuing fatigue since starting Interferon therapy. (R. 314). But at Mr. Brazitis's December 1, 2009 follow-up appointment, the doctor noted that he had "no complain[t]s today." (R. 316). The doctor found Mr. Brazitis's hypertension still well-controlled but found that his iron deficiency anemia was no longer resolved because his hemoglobin level was decreasing again. (R. 317). The doctor also found "mild improvement of his platelets." (R. 317).

On December 15, 2009, Mr. Brazitis had another follow-up appointment where the doctor noted no complaints and that he had regained his appetite. (R. 320). Mr. Brazitis had an examination for cirrhosis of the liver on January 14, 2009. (R. 322). The doctor found his liver enlarged and diagnosed him with hepatomegaly with likely cirrhosis. (R. 322). By February 2, 2010, Mr. Brazitis had completed the Interferon treatment. (R. 324).

## C.
### The Administrative Hearing Testimony

### 1.
### Mr. Brazitis's Testimony

Mr. Brazitis asserts that he is disabled as of January 1, 2006. (R. 6). At his hearing before the ALJ, Mr. Brazitis testified that he was single, had two sons, and was living with his mother. (R. 9). Mr. Brazitis graduated from high school and could read and write English. (R. 9–10). He was six feet tall and weighed 155 pounds. (R. 9). His mother drove him to the hearing. (R. 10). Mr. Brazitis had a restricted driving permit because of a 1992 DUI and a few later

instances of driving on a revoked license. (R. 10–11). To get around, Mr. Brazitis's mother or acquaintances gave him rides or he used public transportation. (R. 11).

Mr. Brazitis's previous employment included tire repair, lift truck operator, and material handler. (R. 11). Because Mr. Brazitis was "not very good with remembering years," (R. 11), his attorney explained and Mr. Brazitis confirmed that his tire repair job was from 1997–2000, his lift truck operator and material handler job was from 2002–2003, and he worked part time performing maintenance in the mobile home park where he lived until 2003, which is the last time he worked. (R. 12).

From 2003 until he stopped drinking on March 1, 2008, Mr. Brazitis had not been in jail or doing drugs—he'd been "mainly drinking" about half a pint to a pint of whiskey per day. (R. 13–14). His mother supported him, and he took out the trash for neighbors to get some money. (R. 14). When asked why he stopped drinking, Mr. Brazitis testified that "it was the anemia. I guess fatigue. I couldn't understand why at the time but I was just unable to stand, unable to, to do anything." (R. 15). He quit drinking because he "really felt [he] was that close to dying." (R. 15). He joined Alcoholics Anonymous (AA), got a sponsor, and attended meetings at least three times a week. (R. 16).

Mr. Brazitis testified that his anemia caused him to feel "just very tired and worn out feeling." (R. 17). At the time of his hearing, he didn't take medication for the anemia but had in the past. (R. 17). He was taking medication for high blood pressure and erosive esophagus. (R. 17). Mr. Brazitis had a six-month Interferon treatment for his hepatitis C that ended two months before the hearing. (R. 17). Although blood tests showed improvement, Mr. Brazitis testified that he didn't feel any different after the treatments. (R. 18). Mr. Brazitis also had possible liver sclerosis but had not yet received the results from the ultrasound by the hearing. (R. 19).

Mr. Brazitis then testified about how his condition affected his daily life. He testified that he was able to make a "very minimal" contribution to help his mother with cooking or the dishes because his condition prevented him from doing more. (R. 19). His mother did all the cooking and grocery shopping, but Mr. Brazitis cleaned up after himself and did his own laundry. (R. 20–21). His days consisted of watching a lot television, feeding the dog, and taking the dog for short walks. (R. 20, 22). Mr. Brazitis explained that he didn't have to walk the dog very far because he could put the dog out in the small piece of yard by his mobile home. (R. 20). Mr. Brazitis also went to AA meetings and church on Sunday. (R. 21). He could also perform all of his personal care such as brushing his teeth, trimming his beard, getting dressed, and taking a shower. (R. 21). Mr. Brazitis estimated that he could stand for about 15–20 minutes at a time and could walk about 1–2 blocks before needing a small rest. (R. 21). He didn't use a cane or walker. (R. 21). For sitting, Mr. Brazitis estimated that he could sit upright for 20–30 minutes at a time, and he normally watched television while lying down on the couch. (R. 21–22). Mr. Brazitis estimated that he could lift no more than 15–20 pounds. (R. 22). When asked if he could sit through an hour-long television show, Mr. Brazitis replied, "I usually don't with commercials or what not." (R. 22).

Mr. Brazitis testified that he lost concentration when he read the newspaper and had a pretty good long-term memory but his short-term memory was not good. (R. 23, 52). In terms of how he got along with other people, Mr. Brazitis testified that he was not a social person and that "I've been sick for the last couple of years but prior to that I would not be one to run away from a confrontation." (R. 23).

In terms of sleeping and napping, Mr. Brazitis said that getting up was a problem because he didn't have a regular sleep pattern and doesn't have "anything really set." (R. 19–20). Mr. Brazitis later clarified that his lack of a sleep schedule was because he's having difficulty sleeping. (R.23) He would want to go to bed but wasn't able to fall asleep and when he did, he only slept three hours at a time before waking up for an hour and then going back to sleep for another two hours. (R. 23). When he got up in the morning varied, and he napped every day. (R. 23–24). If he got up at 8:00 a.m., he had to lie down for a nap about noon and would nap for an hour to an hour and a half. (R. 24). When Mr. Brazitis went to doctors' appointments, he was "known to fall asleep in the waiting room," but his attorney commented that "I'm sure you're not the first person at Stroger to do that" and the ALJ clarified that Mr. Brazitis sometimes had to wait for a long time there. (R. 25). Mr. Brazitis's trips to his doctors' appointments via public transportation took four-to-five hours for a short appointment, and when he returned home "it [wa]s nap time." (R. 25). Mr. Brazitis's energy level was bad before, and became worse during, his Interferon treatment. (R. 27). Mr. Brazitis asked his doctor on his most recent appointment about his low energy, and the doctor told him to be patient. (R. 27).

When asked why he waited until September 2008 to file for disability when he said that his impairments began in January 2006, Mr. Brazitis responded that he didn't know that disability would be available to him and he filed when he found out about it through someone in AA. (R. 13).

## 2.
### The Vocational Expert's Testimony

Julie Lynn Bose testified as an impartial vocational expert ("VE"). (R. 28–29). The VE characterized Mr. Brazitis's past work as follows: tire sales and service as heavy and semi-skilled; material handler as medium and semi-skilled; and laborer as heavy and unskilled. (R.

30). The ALJ asked the VE to assume a person with Mr. Brazitis's age, education, and work experience, and the ability to perform at the medium exertional level. The VE opined that the hypothetical person would only be able to perform the material handler job but not the tire service or laborer jobs. (R. 30). Changing the exertional level to light and adding limitations of "no ladders, ropes, or scaffolds and only occasional for all the postural limitations" would rule out all of Mr. Brazitis's past work with no transferability of the semi-skilled work to light or sedentary work. (R. 30). However, the VE opined that this more limited second hypothetical person could perform light, unskilled work with jobs such as mail clerk (2300 to 2500 jobs in the area), collator operator (800 to 1000 jobs in the area), and mold machine operator (1400 to 1600 jobs in the area). (R. 31). If this second hypothetical person was "absent three or more days a month due to pain or fatigue associated with a medical impairment or side effects from medication," the VE opined that he would be unemployable. (R. 31). A person limited to sedentary would grid out at age 50. (R. 31). A person limited to sedentary work who required a one-to-two hour daily nap halfway through the work day would be unemployable. (R 31–32). Likewise, a person limited to sedentary work whose focus, concentration, or slow production resulted in a 25% job production reduction would be unemployable. (R. 32).

### D.
### The ALJ's Decision

After finding that Mr. Brazitis had not been engaged in substantial gainful activity since January 1, 2006, his alleged onset date, the ALJ found Mr. Brazitis to have the following severe impairments: hepatitis C, anemia, hypertension, and alcohol abuse in remission. (R. 50). However, the ALJ found that Mr. Brazitis did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in the Commissioner's regulations because he didn't establish all of the required criteria for hepatomegaly with likely

cirrhosis (no indication of ascites or hydrothorax after September 24, 2007 ultrasound revealed moderate ascites) and for anemia (no hematocrit persisting at 30% or less and no blood transfusion on an average of every 2 months after one July 22, 2006 transfusion). (R. 50–51).

The ALJ determined that Mr. Brazitis had the residual functional capacity to perform light work except only occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling with no climbing ladders, ropes, or scaffolds. (R. 51). The ALJ reached this conclusion by considering Mr. Brazitis's testimony and the medical evidence. (R. 51–55). The ALJ recounted Mr. Brazitis's testimony about his daily activities and found that Mr. Brazitis's "medically determinable impairments could reasonably be expected to cause the alleged symptom; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 52).[1]  The ALJ then explained the basis for his residual functional capacity assessment in the medical evidence. The ALJ noted that Mr. Brazitis alleged a January 1, 2006 onset date but didn't receive medical treatment until July 22, 2006 when he was treated for weakness and dizziness for two weeks duration. (R. 52). On September 3, 2006, Mr. Brazitis next received medical treatment for alcohol withdrawal and reported feeling weak and fatigued but independent in activities of daily living. (R. 52). Mr. Brazitis next received medical treatment on September 24, 2007, and an ultrasound revealed hepatomegaly with moderate ascites. (R. 52–53).  At a June 24, 2008 follow-up appointment, Mr. Brazitis reported feeling better, had no ascites collection, well-controlled hypertension, and was taking iron pills for iron deficiency. (R. 53). At his consultative examination in connection with his claim for disability benefits, Mr. Brazitis reported very poor energy, daily naps, and

---

[1] Despite the Seventh Circuit's repeated admonition that this sort of reasoning is illogical and backwards, the ALJs continue to recite this improper formulation.

becoming fatigued with minimal activity. (R. 53). The ALJ noted that Mr. Brazitis "has received regular treatment since his date last insured of June 30, 2008." (R. 53). Mr. Brazitis reported feeling much better on January 20, 2009, and his history of iron deficiency anemia was assessed as resolved on August 25, 2009. (R. 53).

The ALJ then assessed Mr. Brazitis's credibility. First, the ALJ listed his alleged limitations but found that he "continues to engage in a wide array of daily activities." (R. 53). Moreover, Mr. Brazitis received only sporadic medical treatment until September 2007, "had no complaints on October 11, 2007, and he felt fine with no new complaints on August 19, 2008." (R. 54). His "cirrhosis was assessed as likely well compensated" on December 16, 2008, and his hypertension "is listed as well controlled at follow-up visits." (R. 54).

The ALJ gave minimal weight to the determination by the State agency physicians that he could perform medium exertional work because those physicians didn't have later medical evidence. (R. 54). While the ALJ found credible some of Mr. Brazitis's testimony about his past alcoholism and current sobriety, the ALJ did not find all of Mr. Brazitis's testimony about his limitations credible. (R. 54). Finally, the ALJ noted that Mr. Brazitis "admitted that he can lift 15 to 20 pounds and he admitted at the consultative examination that he walks four blocks to his facility a day" and that no source has opined further limitations. (R. 54).

The ALJ found Mr. Brazitis unable to perform his past relevant work based on the VE's testimony that those jobs were medium or heavy in exertional level. (R. 55). However, based on the VE's response to the hypothetical person restricted to light work with other limitations, the ALJ determined that a significant number of jobs exist in the national economy that Mr. Brazitis can perform. (R. 55–56).

Ultimately, the ALJ concluded that Mr. Brazitis had not been under a disability defined from January 1, 2006, through the date of the ALJ's decision. (R. 56).

## III.
## ANALYSIS

### A.
### The Standard of Review

We review the ALJ's decision directly, but we play an "extremely limited" role. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009); *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008). "We do not actually review whether [the claimant] is disabled, but whether the Secretary's finding of not disabled is supported by substantial evidence." *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir. 1993). If it is, the court must affirm the decision. 42 U.S.C. § 405(g). Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). The court may not reweigh evidence or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Simila*, 573 F.3d at 513–14; *Binion v. Chater*, 108 F.3d 833, 841 (7th Cir. 2007). While the standard of review is deferential, the court cannot "rubber stamp" the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).

Although the ALJ need not address every piece of evidence, the ALJ cannot limit discussion to only that evidence that supports the ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of the findings and afford the plaintiff a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*,

578 F.3d 696, 698 (7th Cir.2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). It is a "lax" standard. *Berger*, 516 F.3d at 545. It is enough if the ALJ " 'minimally articulate[s] his or her justification for rejecting or accepting specific evidence of a disability.' " *Berger*, 516 F.3d at 545; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); *Mueller v. Astrue*, 2012 WL 1802075, 1–2 (N.D. Ill. 2012).

**B.**
**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. § 404.1520; *Simila*, 573 F.3d at 512–13; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351–52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352.

## C.
## Mr. Brazitis's Intentions

Mr. Brazitis advances two primary arguments for reversal and remand: (1) the ALJ erred when assessing Mr. Brazitis's credibility and (2) the ALJ failed to identify a record basis for finding that Mr. Brazitis could perform light work on a full-time schedule. (*Plaintiff's Brief in Support of Reversing the Decision of the Commissioner of Social Security*, 1).

## 1.
## The ALJ's Adverse Credibility Determination

Mr. Brazitis criticizes the ALJ's credibility determination for using the stock phrase, "I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Plaintiff's Brief, 7). The Seventh Circuit, noting its frequent use by ALJs in their decisions, has repeatedly criticized this template as "unhelpful," *Shauger v. Astrue*, 675 F.3d 690, 696–97 (7th Cir. 2012), "opaque," *Bjornson v. Astrue*, 671 F.3d 640, 644–45 (7th Cir. 2012), and "meaningless," *Parker v. Astrue*, 597 F.3d 920, 921–22 (7th Cir. 2010), and explained that it backwardly "implies that the ability to work is determined first and is then used to determine the claimant's credibility." *Bjornson*, 671 F.3d at 645–46. More importantly, it fails to indicate which statements are not credible and yields no clue as to what weight the ALJ gave a claimant's testimony. *See Spiva v. Astrue*, 628 F.3d 346 (7th Cir. 2010); *Parker*, 597 F.3d 920.

In short, this sort of boilerplate is inadequate, *by itself*, to support an adverse credibility finding. *Richison v. Astrue*, 2012 WL 377674, *3 (7th Cir. 2012). Conversely, its use by itself does not make a credibility determination invalid. Not supporting a credibility determination

with explanation and evidence from the record does. *See Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011); *Parker*, 597 F.3d at 921–22. As the Commissioner's brief correctly points out, (*Commissioner's Response Brief in Support of Affirming the Decision of the Commissioner*, 6) (hereinafter Commissioner's Response), the ALJ's opinion in this case goes beyond the boilerplate, by examining the plaintiff's daily activities; medical records; the fact that he left his job because he was laid off and not for medical reasons; and his follow-up appointments where he had no complaints and some of his conditions had improved. (R. 53–54). Thus, remand is not required simply because of the ALJ's use of the boilerplate phrasing alone. However, the ALJ's credibility determination is still inadequate because it's not supported with explanation and evidence from the record, as discussed below.

Mr. Brazitis also asserts that "[t]he Seventh Circuit has emphasized that a decision cannot stand when, as here, the ALJ bases the credibility decision on the objective medical evidence." (Plaintiff's Brief, 9). But an ALJ is not bound to credit a plaintiff's complaints insofar as they clash with other, objective medical evidence in the record or if his credibility was otherwise called into question by appropriate evidence, *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007), including discrepancies between objective medical or other evidence and self-reports, which may be evidence of symptom exaggeration. *Sienkiewicz*, 409 F.3d at 804.

Making judgments about whether someone is telling the truth can be a tricky business. A reviewing court lacks direct access to the witnesses, lacks the trier of fact's immersion in the case as a whole, and lacks the specialized tribunal's experience with the type of case under review. *See Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). *Compare Ashcraft v. Tennessee*, 322 U.S. 143, 171, 64 S.Ct. 921, 88 L.Ed. 1192 (1944) (Jackson, J., dissenting) ("a few minutes observation of the parties in the courtroom is more informing than reams of cold

record."). That is why credibility determinations, especially when made by specialists such as the ALJs of the Social Security Administration, are entitled to "special deference." *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010); *Briscoe*, 425 F.3d at 354; *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). Only when the ALJ's determination is patently wrong can it be reversed. *Jones*, 623 F.3d at 1162. Moreover, an ALJ's credibility determination need not be flawless. *Simila*, 573 F.3d at 517. Only when it is "lack[ing] any explanation or support," will it be deemed "patently wrong." *Jones*, 623 F.3d at 1160–62; *Simila*, 573 F.3d at 517; *Elder*, 529 F.3d. at 413–14; *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006); *Berger*, 516 F.3d at 546. Demonstrating that a credibility determination is patently wrong is a "high burden." *Turner v. Astrue*, 390 Fed.Appx. 581, 587 (7th Cir. 2010).

Mr. Brazitis's argues that the ALJ's credibility determination failed to properly analyze his fatigue and need to nap for one-to-two hours every day. Mr. Brazitis takes issue with the ALJ crediting his statements about his ability to lift and walk and his sobriety but not crediting his statements about his napping needs and fatigue symptoms, (Plaintiff's Brief, 6), and argues that the ALJ provided "no reasons for the differentiation," (Plaintiff's Brief, 7), and that the ALJ's failure to properly analyze his claimed fatigue violates the requirement that the ALJ consider all of the regulatory factors. (Plaintiff's Brief, 11).

In making judgments about the veracity of a claimant's statements about his or her symptoms, the ALJ, in addition to considering the objective medical evidence, should consider the following in totality: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effect of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than

medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3). Inconsistencies in the evidence and the extent to which there are any conflicts between the claimant's statements "and the rest of the evidence" are of course significant. 20 C.F.R. §§ 404.1529(c)(4). *Compare Kadia v. Gonzales*, 501 F.3d 817, 820 (7th Cir. 2007) (" 'factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable fact finder would not credit it.' ").

The ALJ's credibility determination involved recounting Mr. Brazitis's testimony about his alleged limitations and then finding "[h]owever, despite these limitations, the claimant continues to engage in a wide array of daily activities." (R. 53). The ALJ found it significant that Mr. Brazitis's typical day included watching television and taking his dog for short walks, that he could clean up after himself, do his own laundry, and perform all personal care, that he left the home to attend AA meetings, church, and social activities three-to-five times per week, and that he reported in September 2006 being independent in activities of daily living. (R. 54). But the Seventh Circuit has repeatedly cautioned against equating an ability to engage in sporadic activities with the ability to work eight hours a day, five consecutive days of the week, *Carradine*, 360 F.3d at 755; *Clifford*, 227 F.3d 863, 872 (7th Cir. 2000); *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000). The ALJ never explained how someone who requires a one-to-two hour midday nap can work a full-time job. Although the ALJ discusses Mr. Brazitis's daily

activities, as required by the regulations, the credibility assessment never explains how these sporadic activities are inconsistent with debilitating fatigue and requiring a daily nap.

The ALJ's credibility determination is also inadequate because it lacks any explanation or support for rejecting Mr. Brazitis's claims about needing to take daily naps. The regulations require consideration of the frequency and duration of symptoms and the measures the claimant uses to alleviate symptoms. Mr. Brazitis's primary reported symptom is fatigue, which he alleviates with daily naps. The ALJ's credibility determination mentions that Mr. Brazitis "takes a nap during the day" (R. 53). This reference suggests the ALJ believed that Mr. Brazitis required his daily naps. The ALJ does not engage in any analysis of this issue. After finding credible Mr. Brazitis's testimony about his past alcoholism and current sobriety, the ALJ states, "[h]owever, as to the alleged extent of limitations on his ability to function, I do not find the claimant's testimony supported by the medical evidence beyond the residual functional capacity set forth above." (R. 54). This vague statement does not provide the necessary analysis of Mr. Brazitis's fatigue symptoms or how he alleviates those symptoms through naps. If the ALJ didn't find Mr. Brazitis's claim about needing naps credible, the ALJ needed to explain why. Moreover, his reference to the RFC shows that he did precisely what the Seventh Circuit has said an ALJ may not do.

Mr. Brazitis also challenges the ALJ's consideration of his treatment history as undercutting his credibility. The Seventh Circuit has warned that "the ALJ 'must not draw any inferences' about a claimant's condition from this failure [to seek regular treatment] unless the ALJ has explored the claimant's explanations as to the lack of medical care" *Craft*, 539 F.3d at 679 (quoting Social Security Ruling 96-7p). *See also Shauger*, 675 F.3d at 696 ("Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's

credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference."). The ALJ here found it significant that Mr. Brazitis didn't "receive any treatment corresponding to his January 1, 2006 alleged onset date." (R. 54) The ALJ also counted against Mr. Brazitis that after receiving treatment twice in 2006, he didn't receive additional treatment for one year. (R. 54). But the ALJ failed to address before drawing these negative inferences why Mr. Brazitis might not have sought regular treatment. The ALJ also inferred that Mr. Brazitis "did well" between his first appointment on July 22, 2006 and his second appointment on September 3, 2006, (R. 54), but the record does not support this rosy interpretation.

Instead, the record shows, and the ALJ's decision noted, that Mr. Brazitis had a history of alcohol abuse and regularly drank one-half to one pint of whiskey daily, which he reported to his doctors on July 22, 2006 and September 3, 2006. (R. 52). While the Commissioner disposes of this problem by arguing that the plaintiff "fails to offer any reason other than his abstention from alcohol," (Commissioner's Response, 7), that argument misses the point. The standard of review is whether the ALJ minimally articulated the justification for a finding. *Berger*, 516 F.3d at 545. Since the ALJ's decision is silent on explaining the reasons for Mr. Brazitis's treatment history, the minimal articulation standard has not been met.

The ALJ's credibility determination takes into account evidence other than sporadic treatment history, such as the fact that Mr. Brazitis left his job because he was laid off and not for medical reasons, that he had no complaints and felt fine with no complaints on October 11, 2007, and August 19, 2008, that his cirrhosis was assessed as likely well compensated on December 16, 2008, and that his hypertension was assessed as well controlled at follow-up appointments. (R. 54). In some cases, the Seventh Circuit has affirmed the ALJ's decision

despite the presence of flaws in reasoning when the ALJ's other reasons are valid, *Halsell v. Astrue*, 357 F. App'x. 717, 722 (7th Cir. 2009) ("[n]ot all of the ALJ's reasons must be valid as long as *enough* of them are"), or when the evidence supporting the ALJ's decision is overwhelming, *McKinzey v. Astrue*, 641 F.3d 884, 893–94 (7th Cir. 2011) ("Although we have noted some problems with the way the ALJ articulated her unfavorable determination[,] . . . we have also concluded that remanding this case to the agency would serve no purpose in light of the overwhelming evidence supporting the ALJ's decision.").

In this case, however, neither of those situations is present. First, unlike *Halsell*, 357 F. App'x at 723, where the ALJ's opinion was supported by enough valid reasons including an uncontradicted doctor's report, a physical therapist's estimate that the claimant had met 75% of her goals, and a doctor's characterization of the claimant's conditions as mild or minimal, the ALJ's other reasons here are much less substantial and suffer from their own flaws. The ALJ finds it significant that Mr. Brazitis's cirrhosis and hypertension were well compensated and well controlled, but Mr. Brazitis said his hepatitis C and anemia cause his fatigue, (R. 17, 27). The ALJ's credibility determination doesn't mention those conditions. And, as discussed in the RFC assessment, those two instances where Mr. Brazitis reported no complaints were evidence that the State agency physicians' had when giving their opinions, but the ALJ found these decisions worthy of only minimal weight because of later evidence. (R. 54).

This case is also distinguishable from *McKinzey* where the ALJ's decision was supported by the "smoking gun" that the claimant's own doctor found that she exaggerated her symptoms. *McKinzey*, 641 F.3d at 891. No such smoking gun is present in this case. Instead, the cumulative effect of the errors described above "leave[s] us without confidence that the ALJ's decision

builds a 'logical bridge' between the evidence and . . . conclusion," *Myles v. Astrue*, 582 F.3d 672, 674 (7th Cir. 2009), thus requiring remand.

Mr. Brazitis's argument that the ALJ ignored highly pertinent evidence that Mr. Brazitis "might spontaneously f[a]ll asleep if he missed his mid-day nap and that he spent time lying on the couch, both of which would significantly impact work ability," (Plaintiff's Brief, 12), is not persuasive. Neither piece of evidence that the ALJ ignored qualifies as highly pertinent. First, characterizing Mr. Brazitis as spontaneously falling asleep is inaccurate. This assertion must be relying on Mr. Brazitis's testimony that he sometimes fell asleep in the waiting room at his doctor's office. (R. 25). In Mr. Brazitis's own words, he said that he's "been known to fall asleep in the waiting room." (R. 25). His attorney responded, "I'm sure you're not the first person at Stroger to do that," and the ALJ had Mr. Brazitis clarify that he sometimes must wait at the doctor's office for a long time. (R. 25).

Drifting off while waiting for a long time at a doctor's office is a far cry from spontaneously falling asleep. Second, Mr. Brazitis's own characterization that he "spent time lying on the couch" undermines its weight as evidence that the ALJ should have considered. Mr. Brazitis testified that he normally lies down on the couch to watch television. (R. 22). This is the only evidence in the record about Mr. Brazitis lying down, and it suggests that Mr. Brazitis does lie down when he watches television but not that he must.[2] Because an ALJ need not consider every piece of evidence, *Jones*, 623 F.3d at 1160, the ALJ did not err by not mentioning Mr. Brazitis's testimony about falling asleep in the doctor's office or about lying down while watching television.

---

[2] Moreover, in "Section C - Information About Abilities" of Mr. Brazitis's Function Report that he filled out for the Social Security Administration to make his claim, he did not check "sitting" as one of the items that his illnesses, injuries, or conditions affect. (R. 158). Because the ALJ did not consider this, however, the reviewing court can't either. *See, e.g., Jelinek v. Astrue,* 662 F.3d 805, 812 (7th Cir. 2011).

However, remand is required because the ALJ's credibility determination did not explain how Mr. Brazitis's daily activities are inconsistent with his reported fatigue and need to nap, why the ALJ found Mr. Brazitis's fatigue and nap claims not credible, and what were Mr. Brazitis's reasons for sporadic treatment history before counting it against him.

## 2.
### Sufficiency of the Residual Function Capacity Assessment

Finally, Mr. Brazitis argues that the ALJ's residual functional capacity (RFC) assessment failed to establish a basis in the record for finding that Mr. Brazitis could perform light work because the ALJ didn't identify "any medical evidence that he's capable of the physical requirements of a range of light work on a regular and continuing basis particularly given his fatigue." (Plaintiff's Brief, 14). Mr. Brazitis faults the ALJ for not relying on a physician's opinion and for not explaining how Mr. Brazitis could stand or walk for six hours in an eight-hour work day without needing extra breaks.

The RFC assessment is a consideration of the things a claimant can physically accomplish in order to determine what types of work can be performed. 20 C.F.R. § 404.1545(a)(1); *Berger*, 516 F.3d at 544. When a reviewing court examines the ALJ's RFC determination, it is not to reweigh the evidence or substitute the ALJ's analysis with its own. *Id.*; *Terry*, 580 F.3d at 475. If there is substantial evidence to support that decision, the court must affirm the decision of the ALJ. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). "Substantial evidence" need not be a preponderance, but it must be more than a mere scintilla. *Id.* at 841–42. An ALJ need not elaborate in intricate detail the evaluation of every item in the record, but only allow a reviewing court to "trace the path of the ALJ's reasoning." *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996).

The ALJ concluded that Mr. Brazitis had the ability to perform light work. The ALJ's decision appears to address the RFC assessment in two places. In the first discussion, the ALJ stated "I have considered the objective evidence of the record, and find that this evidence supports my Residual Functional Capacity assessment" and then recounted in detail Mr. Brazitis's medical history, treatment, and symptoms. (R. 52–53). But much of this discussion is not related to what Mr. Brazitis can do physically, which is the purpose of the RFC assessment, and does not include any explanation of what effect the symptoms or medical test results have on Mr. Brazitis's ability to work. In short, this first discussion of the RFC assessment does not allow the path of the ALJ's reasoning to be traced because it does not provide a logical bridge from the evidence to the conclusion.

In the second discussion of the RFC determination, the ALJ decided to give minimal weight to the opinions of the State agency physicians because they didn't have access to subsequent medical records. (R. 54). But the ALJ does not explain what in this subsequently submitted evidence contradicts the State agency physicians' findings that Mr. Brazitis can perform medium exertional work. In fact, the ALJ relied on some of the same evidence that was before the state agency physicians to reach his conclusion that Mr. Brazitis could perform only light work. In the same paragraph where the ALJ decided to give minimal weight to the state agency physicians' opinions, the ALJ noted that Mr. Brazitis "admitted at the consultative examination that he walks four blocks to his facility a day." (R. 54). This admission was evidence that the State agency physicians had when giving their opinions. It doesn't make sense that the ALJ only gives these opinions minimal weight because of subsequent medical evidence but then relies on the same medical evidence as the State agency physicians to support a different RFC assessment.

The ALJ also found it significant that Mr. Brazitis could lift 15 to 20 pounds. (R. 54). Although lifting that amount of weight is part of the ability to perform light work, it involves more than that:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967. Nowhere does the ALJ's RFC assessment address the other components of light work. The Seventh Circuit has found that light work requires "much walking or standing (off and on, for a total of approximately six hours of an eight-hour workday), and, if sitting, it involves some pushing and pulling of the arms or legs." *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995). Walking four blocks a day is not evidence that Mr. Brazitis can perform "a good deal" or "much" walking. Because the ALJ's RFC assessment isn't supported by substantial evidence, remand is required.

## CONCLUSION

The plaintiff's motion for remand is GRANTED, and the Commissioner's motion is denied.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

DATE: 1/11/13